[See note to Case No. 12,046.]

## Case No. 12,046.

### ROSE v. HIMELY et al.

[Bee. 316; [1] 4 Cranch, C. C. 509, append.]

Circuit Court, D. South Carolina. 1805.[2]

PRIZE—FOREIGN CONDEMNATION—BRINGING WITHIN AMERICAN JURISDICTION—PURCHASERS UNDER CONDEMNATION—REVOLUTIONISTS.

[1. The Sarah, an American vessel, sailed from Norfolk, destined for trade with the Haytian ports. At this time, Hayti, a French possession, was in revolt. After trading at several of the Haytian ports, on her voyage from one of them, Port de Paix, she was captured by a French privateer, and carried into Barraçoa, where the supercargo purchased the vessel of the captors, and the cargo was sold by them to the agent for the defendant in this case. The cargo was sent into the United States, and was here libeled by the supercargo. The sentence of condemnation was not entered until after the cargo came into the United States. The French arrêt prohibiting trade with the Haytian ports was not published until about a week after the capture and about two weeks before the sale of the vessel and cargo. Held, that the decree of the French court is not examinable, although on the face of it it appears to have been founded upon an ordinance passed subsequent to the commission of the act for which the vessel and cargo were condemned.]

[2. The French prize court did not lose its jurisdiction over the corpus because the same was brought into our jurisdiction by the purchaser from the captors.]

[3. In the case of a neutral captured under the charge of breach of neutrality the jus postliminii can only attach in case of rescue or recapture.]

[Cited in Juando v. Taylor, Case No. 7,-558.]

[4. The purchasers of the cargo from the captors acquired an inchoate right which was made perfect by the subsequent condemnation.]

[Cited in The Sarah Starr v. The Aigburth, Case No. 12,352.]

[5. The Haytian ports, until the final success of the Haytian revolution, are considered as ports of France, and not as of those of an enemy of France, although at the time under the complete control of the Haytian revolutionists.]

---

[1] [Reported by Hon. Thomas Bee, District Judge.]

[2] [Reversing Case No. 12,047. Decree of circuit court reversed by supreme court in 4 Cranch (8 U. S.) 241.]

[Appeal from the district court of the United States for the district of South Carolina.] In admiralty.

JOHNSON, Circuit Justice. Although there are three distinct libels filed in these cases, yet, in the course of investigation, they are all brought to depend upon the same circumstances, and were argued before me as one cause. The two first were decided in September last, when the copy of the condemnation had not been received, and the decision of the district court rested upon the ground of a defect of condemnation [Case No. 12,-047]. But, upon a motion before this court for leave to adduce new evidence upon the appeal, I decided in favour of its admissibility [Id. 12,045], and the sentence of condemnation having been received before the expiration of the term probatory assigned to the appellants, I am now, consistently with my decision, to consider the condemnation as equally affecting the rights of the parties in all the three cases. At the hearing upon the appeal there was also a witness in behalf of the appellants who testified that he was one of the officers of the capturing vessel, and that he saw in the possession of his captain a permit from the agent of the French government resident at St. Jago, to sell the Sarah and her cargo, and that she was sold by virtue of that permit. But I shall not notice this evidence in framing my opinion, because it appears to me subject to this objection, that a certificate of the granting of such a permit might have been obtained from the chancery of the agent himself if such an officer existed, and did that act in an official capacity. Upon the hearing of the two first causes in the district court the identity of the goods was also a point; and a defect of evidence to prove that identity was strongly insisted upon in the argument; but this ground was relinquished upon the appeal, and the only point contested was the right of property.

The following are the circumstances on which the court proceeds to form its decision, as they are collected from the libels, answers, depositions, and writings in evidence:

The schooner Sarah, an American bottom, owned by citizens of the United States, sailed from Norfolk with a cargo consisting entirely of provisions, owned also by citizens of the United States. For whatever port she cleared, her real destination was to the brigand ports of St. Domingo, several of which she entered; and, having disposed of her cargo, took in return the sugar and coffee which are the subject of this suit. On her voyage from Port de Paix, one of these brigand ports, she was captured by a French privateer and carried into Barracoa, where Rose, the supercargo, and libellant in these cases, purchased her from the captors. The principal part of the cargo was purchased by Captain Cott, of the Example, then lying at Barracoa, in behalf of the respondent

Himely, and transferred during the night from the Sarah to the Example. The Example, having sailed for this port, was followed by Rose; and the sugar and coffee, shipped on board of her from the Sarah, have been libelled on behalf of the original owners. Prior to the suing out of the libel, part of the coffee had been sold to Messrs. Gronings of this place, who are acknowledged to be innocent purchasers without notice; but, as the English doctrine relative to sales in market overt is unknown to the laws of this state. it is not contended that their claim rests on any better ground than that of Himely, or Cott, who purchased immediately from the captors. It appears, that when the cargo of the Sarah was sold, no condemnation had taken place; that she was afterwards libelled and condemned at St. Domingo, on the 13th July, 1804. The Sarah had been captured on the 23d February, 1804; the sale of the cargo took place on the 18th March, and had arrived in this port and been proceeded against by warrants out of the district court, served on the 4th May, 1804, more than two months previous to the date of the sentence of condemnation. Upon examining that sentence, it appears to be professedly founded upon an arrêt of the Captain General Ferrand, dated March 1st, 1804, declaring the port of Santo Domingo to be the only free port in that island, and directing that neutral vessels trading to any other port should be brought to adjudication.

It was asserted in argument, and was, I believe, the fact, that General Le Clerc had formerly issued a similar arrêt; but this has not been proved to the satisfaction of the court, nor does it appear to be one of those facts, the notoriety of which will justify this court in noticing it.

On behalf of the claimants, it is contended, that there is an original defect in the title of the libellants, as the property appears to have been purchased from revolted slaves, a description of people who could not possess, and, of course, could not convey a right of property to others. That there is a turpitude in the trade, which ought to predispose this court to discountenance the pretensions of the libellants. That if the libellants ever possessed a right, it was defeated by the capture which, alone, gave a possession, not to be violated by us; if not by the capture, by the carrying infrà præsidia; if not by carrying infrà præsidia, by the effect of the condemnation.

For the libellant it was argued that there could be no original defect in the title acquired from the brigands, because a power existing de facto, is, to neutrals, a power de jure. That the subjects of the existing government of Hayti were a mixed multitude of slaves and coloured freemen, the latter of whom, before the revolution, possessed extensive estates, and who, for aught we know, may have been the vendors of these articles. That the law of nations knows no

such description of persons as slaves; nor is every description of slaves, even within the United States, destitute of right of property. That opinions on this subject are widely different, and that decisions of courts would fluctuate according to the state in which they were pronounced, and the judge who presided. That if there is turpitude in trading with the brigands, it is equally conspicuous in the conduct of the claimants, in lying in wait to derive a profit from ravages on our commerce, and in the clandestine manner in which the property was transferred from one of these vessels to the other. That the property of the libellants could not be devested by the capture, or carrying infrà præsidia, because a sentence of condemnation is indispensably necessary to change the property. That this sentence of condemnation could not operate to produce that effect: 1st. Because the captors, before condemnation, had parted with that possession which alone could give the court its prize jurisdiction over the property. 2d. Because, before the condemnation, this property had actually been brought within the jurisdiction of our own courts, and thus became revested by the jus postliminii. 3d. Because the sentence of condemnation appears on the face of it to be inconsistent with every idea of law and justice, inasmuch as the fact was committed before the arrêt was passed which was made the foundation of the sentence. 4th. Because it is in direct violation of the twelfth article of the convention with France, inasmuch as the trade to Port au Prince was a trade to the port of an enemy of France, which is sanctioned, under certain restrictions, by that article; and also in violation of the twenty-second article, which enjoins that the adjudication of captured American vessels shall be made by the tribunals of the country into which the prize shall be carried; and of the twentieth article, which prohibits the sale of goods captured before adjudication by competent authority.

Without considering these arguments in detail, I shall recur to the principles adopted by the district court in its decisions, and afterwards cursorily examine such of the arguments of counsel as shall not appear to me to be disposed of by my previous observations. In the decree of September 1804 there are three questions considered: 1st. Whether the libellants could acquire any legal interest by a purchase from the brigands. 2d. Whether the capture and firm possession, without condemnation, could convey a title to the claimants which the court could not violate. 3d. The question of identity. But this last is relinquished on the appeal. The second question no longer exists, since the production of the condemnation: and on the first I would only remark, that it is too much of a refinement upon the acquisition of property in commercial transactions, especially in the purchase of the products of the earth from the actual possessors and cultivators of the soil.

And it is conclusive against the doctrine on this point, insisted on for the claimants, that even the French courts have not ventured to adopt such a principle. But I must here express my dissent from the opinion of my much respected associate in this court, expressed by him in the court below, to wit, "that he had no jurisdiction of the question;" because, whenever a court has jurisdiction of the principal subject of a suit, it must, of necessity, decide upon all questions that occur in the course of investigation, and which have any bearing upon the principal cause of action. Had the libellants never acquired a legal interest in this property, it is clear that their suit must have been dismissed without any inquiry into the subsequent occurrences.

In the decree of the court below of April, 1805, the only subject considered was the effect of the decree of condemnation, and it was declared irrelevant upon two grounds: 1st. Because upon the face of it, it appears to have been founded on an ordinance passed subsequent to the commission of the act for which the vessel and cargo were condemned. 2d. Because the property was actually brought within the jurisdiction of the United States before the sentence of condemnation was pronounced.

Upon considering the first of these grounds it will be perceived that it supposes two things, viz. that a decree of a foreign court is examinable, and that it derives its validity from its correctness; doctrines which, in my opinion, cannot be maintained. The respect required to be shewn to the decrees of foreign tribunals is not founded upon the mere amity of nations. It has for its foundation that universal equality and independence of all governments from which it results, as Vattel observes, that "to undertake to examine the justice of a definitive sentence is an attack on the jurisdiction of him who passed it." It becomes, therefore, an absolute right of nations as universal as the principle on which it depends, and one which we cannot but concede, that "decisions made by the judge of the place, within the extent of his powers, shall be considered as justly made." Not being at liberty to lift up, as it were, the mantle of justice cast about their decrees, it is, as to other courts, immaterial what errors it covers. Neither the fallibility of the judge, the perjury of witnesses, nor the oppression and injustice of nations will sanction a deviation from this general rule. And, perhaps, if this doctrine were not deducible from any fixed principle, nations must long since have adopted it from a necessary attention to general convenience; for, otherwise, the sentence I am now considering might again be reviewed in the courts of Santo Domingo, and from thence return to our own jurisdiction, after making the circuit of all the courts of Europe.

A question will, no doubt, here suggest itself to those who hear me: are our citizens, then, bound to acquiesce under any species of injustice; and do they sue in vain to our courts for relief? The answer is, while our government makes one of the society of nations, we are bound to submit to the obligation of those rules which that society have assumed for their conduct; rules which are founded in truth and wisdom, and, but for the misapplication arising from fraud and flagitious power, are well calculated to produce the best effects.

It is not in our courts that redress is to be sought for the errors and injustice of foreign decisions. Nations pledge to each other the lives and fortunes of their citizens, and even their national existence for the integrity and correctness of their judicial tribunals; "and when justice is refused, or palpable injustice done, or rules and forms openly violated, or an odious distinction adopted to the prejudice of the subjects of another," and negotiation for satisfaction fails, the appeal lies to the ultima ratio of nations. The government is bound to extend a protecting arm to her citizens, while confining themselves strictly within the limits of their duty; and to make compensation to them for such injuries as policy may withhold her from resenting. The jurisdiction of the court of admiralty is of a peculiar nature, acting wholly in rem, and not affecting the rights of any persons whomsoever, except so far as they exist in the thing which is the subject of the libel. Its decrees are conclusive against all the world; a doctrine which, as to the right of property in the subject libelled is strictly and universally correct, "whenever the court is erected within the jurisdictional limits of the power which constitutes it, when the subject is of admiralty jurisdiction, and the court professes to sit and judge according to the law of nations and the style of the admiralty." Nor must it be supposed that, to produce this effect upon the right of property, the decision of the court must be formed upon a just idea of the law of nations, as applied to any particular case. A decision founded upon an erroneous opinion will be as efficient in that respect as one which flows from the most unerring judgment. It is the thing decreed that courts of justice are to regard, and not the reasons from whence the conclusions were deduced. Governments, indeed, will examine into the correctness of proceedings against their citizens, and will insist upon satisfaction, or dissolve the bonds of peace.

It remains for me to consider the second principle upon which the court below founded the decree of April last in favour of the libellant: to wit, "that as the property of the actors was actually brought into their own jurisdiction long before any judicial decision had taken place elsewhere, and as the marshal of this court had custody of it at least three months prior to any such decision, that alone might have been good cause for ordering restitution." In the argument upon this head, counsel contended that it was the pos-

session alone which could bring the subject within the jurisdiction of the court of admiralty that condemned it. That in parting with the possession by the sale, the court lost its jurisdiction, and could not affect the right of property by their decree. The court below, without adopting this idea in the extent contended for, appears to have acted upon another, namely, that coming within our jurisdiction, it could no longer be subject to the courts of France, and the property revested by the jus postliminii. I am sorry to be here again under the necessity of adopting a different opinion. Mere locality will not, of itself, deprive one court of its jurisdiction, nor give jurisdiction to another. A prize brought into our ports by a belligerent continues subject to the jurisdiction of the capturing power, although the corpus be within the limits of another jurisdiction; and it is now the general practice of European nations to condemn in their own courts captured vessels carried into the ports of an ally, or even a neutral. On the other hand, a prize brought into our ports would not by that circumstance, be subjected to our jurisdiction, except in the single case of assuming jurisdiction to protect our neutrality; as in the cases of capture within our jurisdictional limits, or by vessels fitted out in our own ports. Nor does it appear to me that the jus postliminii can attach in this case, because this capture was not a reprisal upon us as a nation, but upon a single offending individual in the commission of an act not authorized by his nation. To satisfy the mind on this subject it is necessary to inquire what is the liability of an individual of a neutral state who commits an act inconsistent with his neutrality, or even with the municipal laws of another nation. How is the state to which he belongs affected by his conduct, and who is to decide upon the offence with which he is charged? As to the tribunals that are to determine on the offence, there is no longer any difference of opinion among civilized nations. Every nation is the arbiter and vindicator of its own rights; and the courts of the capturing power have exclusive jurisdiction of questions arising on supposed breaches of neutrality, the violation of belligerent rights, or even of municipal laws. With regard to the liability of individuals charged with those offences, it is proper to observe that, in strictness, every nation is bound to restrain its own citizens from the commission of offences against all other nations. But, as it is impossible, in the present state of things for the most vigilant government to prevent those aggressions which a love of gain and spirit of adventure are hourly producing, nations have agreed in giving up the individual to the consequences of his own temerity, and the offender is now treated as an individual enemy. He is abandoned by his own government, and cannot even claim the rights of war, but from the humanity or policy of his captor. A consideration which will set this idea in a strong point of view, and shew that he is considered as waging an individual war with the capturing belligerent is that, if he escapes, or rescues his vessel, after the capture, he is never demanded of his government, but avoids the danger as any other enemy would in similar circumstances. If an American vessel, charged with a breach of neutrality, should be captured by a belligerent beyond our jurisdictional limits, and, before condemnation, should be driven into one of our ports either by stress of weather or pursuit of an enemy, will it be contended that this court can interfere to devest the captor of his possession? It must be recollected that such an attempt would draw to this court the jurisdiction of a question which it is the acknowledged right of the belligerent to have decided by his own tribunals. Therefore, in the case of a neutral captured under the charge of breach of neutrality, the jus postliminii can only attach in case of rescue or recapture; and his nation cannot interfere to restore that possession which he has lost by the capture, without becoming a party in the contest. She regards the individual and capturing power as belligerents, between whom she is bound equally to observe the laws of neutrality, and particularly to consider possession as the criterion of right, at least while the cause of capture is in its progress to adjudication.

It will be perceived how large a portion of the argument went to justify, or condemn, the trade in which this vessel was engaged; the one side contending that the libellants had committed no act for which the vessel was liable to condemnation: the other, that they had a question which is exclusively cognizable in the courts of the capturing power, but which this court would be compelled to decide, if the libel be sustained upon a claim interposed on behalf of the captors, or even, I conceive, of their vendee; unless there were reason to contend that the vessel was piratically captured. At the same time I heartily concur in the opinion that, as between neutrals at least, a sentence of condemnation is indispensably necessary to produce a complete devestiture of property; and, unless the neutral property captured be put in train for a legal adjudication, I should think a nation at liberty to seize it, as having been piratically taken. For the capturing power is bound to satisfy a neutral nation that she had a right to attack her citizen; and it will be found, upon reflection, that this cannot be satisfactorily done in any other mode than by a decree of her tribunals of justice.

Much has been said about the different modes adopted by European nations respecting the devestiture of property captured. These rules were universally adopted by the respective nations to regulate the claims of their own citizens in questions of salvage and restitution. In case of alliance in war, each nation extended to its ally the benefit of a rule which ascertained the rights of its own citizens: and the correctness of these rules was

mere matter of speculation, not affecting the interests of neutrals, until 'Great Britain thought proper, in the last war, to exact a salvage on the recapture of neutral property.

There appear to me to remain but two points made by counsel on which it may be necessary for me to remark: 1st. How far the sentence of condemnation would affect the property after the sale. 2d. Whether the whole transaction was not inconsistent with the treaty subsisting between the two nations, and therefore produced no change of property. In the case of Sheaff v. A Parcel of Sugars [Case No. 12,730], decided in this district court in the year 1800, in favour of the purchasers. and confirmed on appeal to the circuit court, the property captured was carried into the Havanna and libelled and condemned in a French court sitting at the Cape. The sale also took place prior to the condemnation. It was indeed asserted in that case, as in this. that the sale was made with consent of the captain; but there was no evidence to prove it. In two important features, then, these cases are parallel, and I might rest my opinion as to this point on precedent alone. But it affords me more satisfaction to be able to decide on principle also. As the sale was not made by order of a competent tribunal, and was made by the captors at a time when their right was not consummated by a judicial decision, the claimant, in this case, could have acquired no more than an inchoate right, subject to be confirmed or defeated by the event of the decision of the court to which the cause was referred. That is, he acquired no greater interest than that of the captor from whom he purchased. Had the decision been against the captors, with the evidence now before me I should not hesitate to decide in favour of restitution; but by the decree of condemnation the government of France has made the act of capture its own, and all questions of individual interest are at an end. The whole of the arguments founded on the violation of the treaty is subject to the general objection, that they lead to a revision of the decree of a foreign tribunal. The French courts are bound by the convention with France, and it is to be presumed that they bear it in mind in their decision. They possess the same power in construing its meaning and effects that we do; and though their opinion may be erroneous, their decree would not therefore be vitiated.

With regard to the ground of argument drawn from the 12th article, to wit, that Port de Paix is the port of an enemy of France, and therefore a trade with it is sanctioned by that article, I think it totally incorrect in point of fact. France has not yet relinquished the contest; and. until she does, I must think that all the ports of that island are still ports of France; that she possesses a right to exclude all commerce with them; and to affix a penalty for breach of this exclusion. There is a peculiarity in the unhappy conflict raging in that devoted island. which should make us hesitate in applying to it the rules of war as

between independent nations. Great Britain. deeply interested as she is in distressing and embarrassing France, has not ventured to apply the laws of war to this newly erected empire. On the contrary, she condemns our vessels carrying contraband of war to the brig and ports, as if to the ports of her enemy, although. in fact, they are carried to the most inveterate enemies of her rival.

As the 20th article of the convention relates only to capture for carrying contraband of war to an enemy's port, I shall pass it over without any observations; and shall close with a few remarks on the 22d article, the last noticed in the argument. The first clause of this article, and the only one relative to this case, is in the following words: "It is further agreed, that in all cases, the established courts for prize causes, in the country to which prizes may be conducted, shall take cognizance of them." It strikes me upon an attentive consideration of this article, that the only object of it was a recognition of the established doctrine that the courts of the capturing power shall judge of the legality of capture; and to add the very necessary provision that the reasons of condemnation shall be, in all cases, expressed in their decrees. But certainly the words literally taken will produce the inference contended for by counsel, to wit, that vessels captured from our citizens by France cannot be condemned except in a French port. It would be absurd to suppose that it was intended to give jurisdiction to the courts of any neutral or ally into whose ports such prizes might be carried. If this were a just construction of the article, it would only follow that a violation of the treaty had been committed for which France is bound to make atonement; and that the court of admiralty of Santo Domingo was incorrect in proceeding to adjudicate a vessel not lying in their own port: but I conceive that the validity of the decree would be still unshaken. If this article was not brought to the notice of that court, it may well be attributed to the laches of the libellant himself. in not making this defence, nor indeed any other, in a court that was open to his claim. But there is a liberality and candour in the construction of treaties which would make me reject the one here contended for, were it necessary to decide upon it. For, I could never be induced to think that a point of such importance would be left to mere inference, by the able men who negotiated that treaty, when it could so easily have been expressed in a single unequivocal sentence. Nor do I think that the interest of the neutral would be promoted by a construction subjecting the fair trader to the melancholy inconvenience of detention in some distant port, until he could be safely conveyed to that of the captor for adjudication; or be exposed, perhaps, to the perils of the ocean during a tedious voyage, for the same purpose.

Upon the whole, I am of opinion that the decrees in these cases should be reversed. and the libels be dismissed. But as the claimant

purchased before condemnation, and the libel-
lant had a fair claim to this investigation, let
each party pay his own costs.

[NOTE. An appeal was taken from this de-
cision to the supreme court, which reversed
the decree of this court, and remanded the
cause for final decree in pursuance to the opin-
ion therein delivered. 4 Cranch (8 U. S.) 241.
The decree of the supreme court directed "the
cargo of the Sarah to be restored to the original
owners, subject to those charges of freight, in-
surance, and other expenses which would have
been incurred by them in bringing the cargo
into the United States." In carrying this de-
cree into execution the circuit court made a final
decree making no allowance for expenses at the
port of landing nor for insurance. It also
charged the claimants with interest on the mon-
ey into which the cargo had been converted.
(Opinion of the circuit court not reported. But
see dissenting opinion in the case on appeal of
Mr. Justice Johnson, who delivered the opin-
ion below.) An appeal from this decree was
taken to the supreme court, where the decree
below upon these points was reversed. Mr.
Chief Justice Marshall delivered the opinion.
Mr. Justice Johnson dissenting. 5 Cranch (9
U. S.) 313.]